BRUCE F. SHERMAN          #5996
1050 Bishop Street, Suite 509
Honolulu, Hawaii 96813
Tel: (808) 221-0901
Email: bfs@bfshermanlaw.com

JAMES L. WEISMAN          #7844
US Mail: PO Box 88106
Honolulu, Hawaii 96830-8106
Tel: (808) 728-4143
Fax: (808) 748-3000
Email: AnInjuryLawyer@Gmail.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARK J. HEMZA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>FORD MOTOR COMPANY, VALLEY ISLE MOTORS, LIMITED,  DOES 1-10,<br><br>　　　　　Defendants. | CIVIL NO.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Mark J. Hemza, above-captioned, for a Complaint against the above-captioned Defendants, and each of them, states as follows:

### INTRODUCTION

1.　　This is a consumer protection action brought under the Truth in Lending Act (TILA), 15 U.S.C. §1601 *et seq*., the Fair Credit Reporting Act (FCRA), 15 U.S.C. §1681 *et seq.*, and the Magnuson-Moss Warranty Act (MMWA), 15 U.S.C. §2301 *et seq*., as well as Hawaii Revised Statutes (H.R.S.) Chapter 480, Hawaii Credit Sales H.R.S. Chapter 473, and other law,

for, *inter alia*, Defendants' pattern and practice of falsely, unfairly, and/or deceptively marketing, advertising, and on March 13, 2016 financing and selling to Plaintiff, Mr. Hemza, a new 2016 Ford Focus PowerShift Transmission vehicle (the subject transaction and vehicle).  Defendants unlawfully lured Plaintiff offering a 0% financing promotion for the subject vehicle and said Plaintiff qualified, but then in a bait and switch retracted this rate, saying its lenders were unwilling to finance at this rate based on Plaintiff's credit report, while never providing the adverse action notice required by the FCRA; unlawfully described the vehicle as "automatic" while actively concealing its known special defective shifting characteristics materially differentiating it from automatic transmission vehicles later revealed in Service Bulletins describing the transmission as essentially two manuals; promised to repair it when they should have known they could not; and failed to refund or replacement after failing to repair the defects – forcing the purchase of yet another, replacement vehicle.  Plaintiff seeks actual, treble, punitive, and statutory damages and reasonable attorney's fees and costs of suit for these violations.

## JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to the Truth in Lending Act (TILA), 15 U.S.C. §1601 *et seq.*, the Fair Credit Reporting Act (FCRA), 15 U.S.C. §1681 *et seq.,* and the Magnuson-Moss Warranty Act (MMWA), 15 U.S.C. §2301 *et seq*.  The supplemental jurisdiction of this Court is invoked for Hawaii Revised Statutes (H.R.S.) Chapter 480 and Hawaii Credit Sales H.R.S. Chapter 473.

## PARTIES

3. At all times material to this Complaint, Plaintiff Mark J. Hemza resided in the County of Maui, State of Hawaii.

4. At all times material to this Complaint, Defendant VALLEY ISLE MOTORS, LIMITED, aka VALLEY ISLE MOTORS, LTD., ("Valley Isle Motors" or "the dealer") resided and/or conducted business in Wailuku, County of Maui, State of Hawaii.  It is a domestic profit corporation.

5. At all times material to this Complaint, Defendant FORD MOTOR COMPANY

("Ford") conducted business, solicited business, distributed, sold, warranted, serviced, and guided the servicing of them, in Wailuku, County of Maui, State of Hawaii. It is a foreign profit corporation.

6. Doe Defendants are sued herein under fictitious names for the reason that, despite diligent and good faith efforts to obtain information, their true names and identities are presently unknown, except that they were connected in some manner with the named Defendant or one or more of them and/or are employees, employers, agents, representatives, co-venturers, associates, vendors, suppliers, manufacturers, subcontractors, contractors or consultants of the named Defendant; and/or were in some manner presently unknown, engaging in the activities alleged herein; and/or were in some manner responsible for the injuries or damages herein; and that their true names, identities, capacities, activities and/or responsibilities are presently unknown. Leave of this Court is requested to identify the Doe Defendant if and when their identities are ascertained.

7. On information and belief, at all times material to this Complaint, any and all other Defendants also resided, worked, and/or did business in Wailuku, County of Maui, State of Hawaii.

## FACTS

8. On March 13, 2016, Mr. Hemza went with his friend to Defendant Valley Isle Motors' Wailuku, Maui automobile dealership, and met its sales representative, Mr. Lee.

9. They told Mr. Lee that they wanted a reliable automatic transmission vehicle (automatic) to replace the reliable automatic she had been driving for the past 18 years, and that they were there to purchase a Mazda 3 automatic.

10. They then test drove a couple of Mazda 3s, but the dealer did not have the color they wanted. They told Mr. Lee they were willing to wait for their desired color to be in stock. Mr. Lee said that he didn't know when the desired Mazda was going to come in and kept repeating the material and, on information and belief, false statements that: the Mazdas were coming in the shop a lot, they had two in the shop at that time, they were waiting on parts because parts were hard to get for that particular car as it was foreign, the Ford was the better runner, it was easier to fix and work on, and the Mazda was going to be a difficult car.

3

11. Mr. Lee then guided them to the subject Ford Focus PowerShift Transmission vehicle. This act implied the vehicle was suitable for their expressed purposes, of being a reliable automatic, when it was not and when the dealer knew or should have known it was not.

12. A true copy of part of the F.T.C. Buyer's Guide window sticker on the subject vehicle at this time follows:



The sticker clearly falsely repeatedly described the vehicle as an "AUTOMATIC TRANSMISSION" vehicle. Defendants then knew or should have known that the vehicle did not drive like an automatic vehicle.

13. They discussed the PowerShift Transmission option. Mr. Lee falsely identified it as an automatic transmission and further assured them that it drove like an automatic.

14. During the test drive, Mr. Lee turned the A/C on full and used the radio, and limited the test drive to just around the block. These acts made it impossible for them to detect, and concealed, the shuttering, slipping, revving (jumping), loud noises, vibrations, and other defects of the subject vehicle's PowerShift Transmission.

15. At the time these statements were made, the subject vehicle, and PowerShift Transmission Ford models generally, had been known to Defendants to be defective, unreliable, and not operate like automatics.

16. Defendants' knowledge of this is shown by years of prior Ford's Technical Service Bulletins ("TSBs") to its dealers, including on information and belief, to Valley Isle Motors.

17.     Defendant's knowledge of this is also shown by the "ATTACHED POWERSHIFT 6-SPEED TRANSMISSION OPERATING CHARACTERISTICS" document given to Mr. Hemza when he presented the subject vehicle to Defendants to repair the defects, which read:

> "The PowerShift is really like two 3-speed manual transmissions put together, with the dual clutch and shifting components controlled electronically.  Since most of the components are derived from a manual transmission, the PowerShift Transmission will drive, sound, and feel like a manual transmission..."

18.     Had this document or information been disclosed to Mr. Hemza at the time of sale, he would not have purchased the subject vehicle.

19.     PowerShift Transmissions the same and substantially identical to that in the subject vehicle had been used in Ford's Focus and Fiesta lines of vehicles, for several years before the date of the subject transaction.

20.     The PowerShift Transmission has had numerous problems and safety concerns dating back to the 2011 year model, sold in 2010.  The PowerShift Transmission contains one or more design and/or manufacturing defects that cause, among other problems, shuttering, revving, slipping, jumping, unreasonably loud noises, excessive vibrations, bucking, kicking, jerking, harsh engagement, premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, and difficulty stopping the vehicle (the "Transmission Defect").

21.     The Transmission Defect causes unsafe conditions, including, but not limited to, vehicles suddenly lurching forward, delayed acceleration, rolling backward on inclines, and sudden loss of forward propulsion. These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration. For example, these conditions make it difficult to safely merge into traffic.  The Transmission Defect can cause the vehicle to fail to downshift and decelerate when the brakes are depressed. As a result, PowerShift Transmission owners have experienced their cars lurching forward into intersections at red lights due to the failure of their braking efforts to stop the car.

22.     On information and belief, the Transmission Defect also causes premature wear to the Dual Clutch Transmission's clutch plates and other components, which results in premature transmission failure and requires expensive repairs, including transmission replacement.

23. Numerous complaints relating to the PowerShift Transmission Defect dating back to 2010 can be found at htttps://www.nhtsa.gov, visited June 1, 2017.

24. Beginning as early as 2010, Ford knew or should have known that the PowerShift Transmission contained one or more design and/or manufacturing defects that negatively affected drivability and caused safety hazards.

25. On information and belief: years before the subject transaction, Defendants knew, or should have known, about the Transmission Defect through its exclusive knowledge of non-public, internal data about the Transmission Defect, including, pre-release testing data; early consumer complaints about the Transmission Defect to Defendant's dealers who are their agents for vehicle repairs; dealership repair orders; testing conducted in response to those complaints; TSBs; the existence of the defect in the substantially identical European and Australian model vehicles; and other internal sources. Nevertheless, Defendants have actively concealed and failed to disclose the Transmission Defect to Mr. Hemza at the time of purchase, or at the time of its inspection/repairs, through to the present.

26. As a result of the Transmission Defect, in 2010 and 2011, Ford issued several TSBs to its dealers in the United States acknowledging defects in the PowerShift Transmission. Ford's TSB from September, 2010, covering the 2011 Ford Fiesta, PowerShift vehicle informed dealers of transmission concerns regarding no engagement, intermittent no engagement, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code.

27. Ford's TSB released on January 1, 2011, covering the 2011 Ford Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing a loss of power, hesitation, surge, or lack of throttle response while driving.

28. Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission exhibited a rattle/grind noise in reverse only.

29. Ford issued two separate TSBs in May of 2011, both covering the Ford Fiesta. These TSBs addressed problems with the PowerShift Transmission including concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement....

30. Another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Ford Fiesta owners complained about hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop.

31. The 2012 Ford Focus was the subject of a September 2011 Ford TSB, which informed dealers of transmission problems including: RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift….

32. In May of 2012, Ford issued a "Customer Satisfaction Program: Program Number 12B37." In a letter sent to 2012 Ford Focus drivers, Ford indicated: that drivers may experience rough or jerky automatic transmission shifts, and that vehicles may experience roll back when the driver is transitioning from the brake pedal to the accelerator pedal while on a slight incline. Ford did not issue a recall and did not warn drivers of the safety risks associated with these known problems.

33. Prior to the date of the subject transaction and/or repairs there were also a variety of national and international class action complaints about the Transmission Defects, including in the U.S.A., Canada, and Australia. For this reason also, Defendants were or should have been aware of the Transmission Defects.

34. Defendants at least negligently misrepresented the subject vehicle to Mr. Hemza as being suitable, reliable, and automatic when it was none of the foregoing.

35. True copies of three parts of the FTC Buyer's Guide window sticker on the subject vehicle during the subject transaction follow:

 

36. Defendants offered the subject vehicle with the base Ford Warranty, and ESP, covering the PowerShift Transmission and its Transmission Defects, which Defendants knew or should have known they were incapable of repairing/honoring at the time.

37. Ford sold, distributed, and/or marketed the subject vehicle with Hawaii's implied warranties of merchantability and fitness which Ford knew or should have known it were

7

incapable of repairing/honoring at the time.

38. Mr. Hemza saw the foregoing Window Sticker and requested to have the Extended Service Plan (ESP). Mr. Hemza and his friend explained to Mr. Lee that they wanted to replace a no hassle, worry free vehicle with another of like characteristics. Mr. Lee assured them the dealer would send the ESP documentation to them after the purchase. The ESP was material to this purchase. Despite this assurance and the window sticker, the dealer never followed through with its promised ESP documentation.

39. The foregoing constitutes multiple discreet violations of H.R.S. Chapter 480, each of which caused Mr. Hemza damages, including special damages.

## 0% APR BAIT AND SWITCH; BEST RATE HIGHER; NO ADVERSE NOTICE

40. Plaintiff incorporates by reference the other paragraphs of this Complaint.

41. The dealer informed Mr. Hemza it was offering 0% financing to qualified purchasers on the subject vehicle. The dealer informed Mr. Hemza that it had to run Plaintiff's credit report to see if he qualified for 0% financing. Mr. Hemza told the dealer he did not want his credit report run and wanted to buy the subject vehicle with cash and credit cards. The dealer said it could not accept this amount on credit cards. Mr. Hemza knew his credit was excellent and should qualify for the 0% promotion. On this basis, the dealer ran Mr. Hemza's credit.

42. After running his credit, the dealer then informed Mr. Hemza that his score easily qualified for the 0% financing on the subject vehicle.

43. This stopped Mr. Hemza from shopping around at other dealers or banks to arrange his own better financing.

44. Despite this 0% APR assurance, Mr. Hemza's interest rate jumped to 3.99% on the subject vehicle. This was a bait and switch in violation of H.R.S. Chapter 480 and other law.

45. When Mr. Hemza then repeatedly objected at the jump in interest rate, the dealer repeatedly explained that 3.99% was the best rate the dealer could get from its various lenders when it ran his credit report.

46. The dealer also told Mr. Hemza that "Yours was the only car sold today" and on this basis the dealer was going to make the sale. The implication is the dealer was not profiting on the sale when it was.

8

47. Based on these repeated best bank rate and other assurances, Mr. Hemza dropped the issue and signed the contract.

48. On information and belief: these best rate assurances were false; the dealer was pocketing a markup or "dealer reserve" and could have provided a better rate, or Mr. Hemza could have independently shopped around and found a better rate on his own; this was the best rate the dealer, not the best rate its lenders, was offering.  This implied multiple lenders would go no lower that 3.99% after the dealer had shopped around for the lowest rate, depriving Mr. Hemza of the reasonable opportunity to negotiate or shop banks for a better rate.

49. Also all of the agreement is required by Credit Sales contract law, H.R.S. §473-3, to be disclosed in writing in the Credit Sale contract.  This contract does not state whether the dealer received part of the Finance Charge herein.  The foregoing violates §473-3 triggering the remedies in §476-21: "an amount equal to the finance charge" ($905) and "costs of the action, together with a reasonable attorney's fee."  It also violates H.R.S. Chapter 480.

50. The dealer never provided Mr. Hemza with an adverse action notice as required by the FCRA §1681m.  Mr. Hemza was never informed by the dealer which consumer reporting agency was contacted, and therefore he never had the chance to obtain from his 15 U.S.C. §1681j free credit file disclosure which are by default charged to the consumer, challenge the accuracy and completeness of the contents, and obtain better financing terms on this and subsequent transactions.

51. The foregoing entitles Mr. Hemza to, e.g., actual or statutory damages, punitive damages, and the costs of the action together with reasonable attorney's fees under 15 U.S.C. §1681n and o.  It entitles Mr. Hemza to recover twice the finance charge under TILA §1640.  It also violates H.R.S. Chapter 480.

52. Mr. Hemza only allowed his credit to be run to qualify for the 0% APR promotion, which he reasonably expected he would qualify for based on his excellent credit.

53. In the alternate, if the dealer was not really offering 0% APR to qualified customers when it told Mr. Hemza it was, to induce him to authorize it to run his credit report, the protected credit report information was obtained and sent to third parties, including First Hawaiian Bank, without Mr. Hemza's consent.

54. Mr. Hemza also suffered damages in that each inquiry lowers the subject's credit

worthiness and makes it harder to obtain credit. The foregoing was also a common law intrusion upon seclusion and violates other Hawaii privacy law, triggering H.R.S. Chapter 480. This was an unauthorized credit inquiry violating the FCRA and as such and otherwise violating H.R.S. Chapter 480, entitling Mr. Hemza to void the transaction and recover sums paid, statutory and treble damages, costs, and reasonable attorney's fees.

DECEPTIVE TILA PAPERWORK

55. Plaintiff incorporates by reference the other paragraphs of this Complaint.

56. The dealer had Mr. Hemza sign a "TRUTH IN LENDING ACT DISCLOSURE AFFIRMATION" form attempting to have him affirm that:

> "I, <u>MARK J. HEMZA</u>, as indicated by my signature below, affirm the following:
>
> Please check the applicable boxes.
>
> In the course of discussing funding options:
>
> ☐ I requested and took into my possession, for the purpose of reviewing its contents, a blank copy of the funding agreement.
>
> In the course of the funding agreement disclosure:
>
> ☐ I received the fully completed contract and was given ample time to review its contents, including the itemized charges for the optional products and services, before I was asked to sign it.
>
> After reviewing the contents of the funding document:
>
> ☐ I had questions that were answered to my satisfaction before I was asked to sign the agreement.
>
> ☐ I did not have any questions and signed the agreement with a clear understanding of its terms and conditions.
>
> ☐ I received an executed copy of the funding agreement to keep in my possession, after its contents were disclosed and I signed it..."

The form has lines for "Customer Signature", "Date", and "Dealer Representative" and concludes: "White copy to the customer   Yellow copy to the deal jacket." While Mr. Hemza and the dealer's representative signed the form dated the date of the transaction, the boxes remained unchecked and the bulk of these attempted affirmations were false.

57. Of the five TILA boxes, in order: #1 was false. #2 was false. The dealer rushed him through paperwork, and said if Mr. Hemza had questions, just come in or call afterward. #3 was false. #4 was false. Mr. Hemza had questions about extended warranty, and was told that for any questions he had to come back by, or call, because it was late and they were in a hurry to get out of there. #5 was false.

58. The dealer thus violated the law in many ways and then tried to have the customer sign a document that the law was never violated for its defense. The foregoing are each separate violations, and together a collective violation, of the TILA, related regulations, and H.R.S. Chapter 480.

## UNFAIR OR DECEPTIVE REPAIRS AND MMWA VIOLATIONS

59. Plaintiff incorporates by reference the other paragraphs of this Complaint.

60. After the transaction, Mr. Hemza and his friend immediately began experiencing the following persisting problems with the subject vehicle's defective PowerShift Transmission:

- The vehicle transmission excessively and unreasonably shuttered, slipped, and revved (jumped). Ford's authorized dealer's own expert, in a consensually recorded test ride, admitted on record that the shuttering that he observed felt beyond the 250 specified limit for this model, over which a new transmission was Ford's remedy.
- When stopped at lights/signs, on the slightest incline, the vehicle rolled backward which could have injured occupants or injured or even killed third parties and also could have caused substantial first and third party property damage.
- The vehicle also sometimes jerked/lunged when starting from stopped position, got stuck in a gear and failed to go to the next higher gear, stuttered at take-off and around corners.

61. These defects could not be repaired, to the point where Mr. Hemza and his friend did not feel safe driving the subject vehicle. The peace of mind that is supposed to come with the major purchase of a new vehicle with warranty was shattered. Defendants failed to provide any of the requisite remedies of repair, replace, and refund, despite a reasonable number of repair

attempts, in violation of the MMWA and as such also H.R.S. Chapter 480.

62. After the transaction, Defendants engaged in further deceptive practices during the repair period to conceal the transmission problem: Mr. Hemza was told that after a break-in time and driver pattern adjustment the transmission problem would go away, but they did not and never would as these problems were inherent in the unit and/or design of the same and substantially identical PowerShift Transmissions. On information and belief, Ford's dealers likewise falsely told similarly situated consumers in the USA, Canada, and Australia that a break-in time and driver pattern adjustment was needed for the vehicles to operate smoothly. This caused delay and damages keeping Mr. Hemza and similarly situated consumers away from their rights or repair, replace, or refund.

63. Repair Order 532397 herein, shows **Mr. Hemza first brought the vehicle for transmission problem service on March 22, 2016, just 9 days after the March 13, 2016 vehicle purchase**: "CUSTOMER STATED THAT THE TRANSMISSION ON ACEL RPM GOES UP FIRST BEFORE VEHICLE MOVES BEWTEEN 1-2 SHIFTS. INSPECT AND REPORT TRANSMISSION". **The mileage in was 173**.

64. That Order continues: "PERFORMED ROAD TEST HOOK UP IDS AND CHECK FOR UPDATES NONE. REFORMED TCM ADAPTIVE LEARN STRATEGY CLEAR CMDTC ROAD TEST GOOD." But the mileage out at 1:40pm later that same day was also only 173. It violates H.R.S. Chapter 480 and other law to pretend to conduct road tests that were never conducted or falsify mileage on repair records; to inform the consumer that it is the way they are driving which is causing the problem, when the problem is an irreparably defective transmission that will never operate smoothly like an automatic; and to do or pretend to do inspections and road tests to conceal an incapacity to repair defects that Defendants knew or should have known were irreparable.

65. Repair Order 535142 shows that Mr. Hemza brought the vehicle in for service from 7:16am to 9:34pm on May 16, 2016, at mileage 1258 for "CUSTOMER CONCERN TRANS SLIPPING IN HIGH GEAR TRANSMISSION". This record continues: "TECH ROAD TESTED SLIPPING CHECKED FOR UPDATE ON PCM AND TCM. PERFORMED ADAPTIVE LEARNING STRATEGY CLEARED CMOTC, TECH ROAD TESTED SYSTEM RUNNING FINE AT THIS TIME". But the mileage out is 1258, the same 1258 as the mileage

in.

66.    Repair Order 536399 shows that Mr. Hemza brought the vehicle in at 7:29am on June 14, 2016: "CUSTOMER STATED THAT THE TRANSMISSION SHIFTING 1 2 AND 2 3 RPMS GOES HIGH BEFORE SHIFTING, AND SLIPPING , ALSO STOPPED ON SLIGHT INCLINE AT LIGHT WILL ROLL BACK BEFORE GOING FORWARD THEN WHEN DOWN SHIFTING INTO 5TH GEAR TRARNSMISSION WON'T UPSHIFT BACK INTO 6TH GEAR HAVE TO GO HIGHER SPEEDS INSPECT AND REPORT TRANSMISSION".

67.    The same Order shows that when Mr. Hemza came to get his vehicle at 2:43pm on the same day he was led to believe that the vehicle had been test driven during this service: "ROAD TEST FOR CONCERN CHECK FOR UPDATES, NONE, NO DTC CODES, NO PROBLEM FOUND ATTACHED PowerShift 6-SPEED TRANSMISSION OPERATING CHARACTERISTICS".  But the Order shows that mileage was the same in (1865) and out (1865).

68.    Repair Order 540592 shows Mr. Hemza brought the vehicle in for service at mileage 4236 at 9:30am September 22, 2016 for: "CUSTOMER STATED THAT THE TRANSMISSION MAKES CLANKING SOUNDS, ON ACEL FROM STOP OR TURNS VEHICLE SHUDDERS AND AT TIME RPM JUMPS BEFORE VEHICLE MOVES AT TIMES WON'T UP SHIFT TO 6TH GEAR  INSPECT AND REPORT.  This record indicates the dealer test drove the vehicle for this: "ROAD TEST FOR NOISE AND SHUDDER DURING SHIFTS, RUN OASIS CHECKED FOR CODES, NO CODES PERFORMED TSB 16-0109 RE-CALIBRATE THE PCM TCM DRIVE WITH MONITOR. VEHICLE WITHIN EXPECTED LIMITS. ROAD TEST DRIVE COLD AND HOT OPERATION NORMAL AT THIS TIME." Here the dealer pretended to do cold and hot road test of the transmission before it was returned to Mr. Hemza at 3:52pm on September 23, 2016.  However the mileage in and out are the same: 4236!

69.    Defendants knew this vehicle was irreparable but were concealing this by pretending to test drive/repair it when they never did, and by inviting Mr. Hemza for additional repairs.  Mr. Hemza expended money on fuel to go to and from these sham repairs, and suffered special damages accordingly, triggering H.R.S. §480-13 minimum $1,000 statutory damages for these sham repairs.

13

70. Defendants knew the problems presented could not be corrected, and were just concealing them, as evidenced by the years of, e.g., numerous TSB's between Ford and its dealers. As a result Mr. Hemza, and all others similarly situated, retained the vehicles and were humiliated and made to feel stupid for even thinking there was a defect.

71. The foregoing constitutes multiple individual and collective violations of H.R.S. Chapter 480, and other law, which caused damage to Mr. Hemza, including special damages.

VARIOUSLY UNFAIR AND DECEPTIVE MMWA DISPUTE RESOLUTION PROCESS

72. Plaintiff incorporates by reference the other paragraphs of this Complaint.

73. The Ford Warranty that came with the subject vehicle, requires consumers to pursue BBB AUTO LINE mediation, but not binding mandatory arbitration, before they can bring a Magnuson-Moss Warranty Act (MMWA) legal claim: "You are required to submit your warranty dispute to the BBB AUTO LINE before exercising rights or seeking remedies under the Federal Magnuson-Moss Warranty Act, 15 U.S.C. §2301 et seq." In another section the Warranty reads: "The BBB AUTO LINE program consists of two parts — mediation and arbitration. During mediation, a representative of the BBB will contact both you and Ford Motor Company to explore options for settlement of the claim. If an agreement is not reached during mediation and your claim is eligible, you may participate in the arbitration process." Clearly a reasonable consumer would conclude they have to participate in BBB mediation but not arbitration.

74. Apart from being a cumbersome and paperwork intensive process, when Mr. Hemza initiated the complaint with BBB AUTO LINE, he was presented with a BBB AUTO LINE, Customer Claim Form to sign, which at the signature line reads: "I am submitting this dispute for resolution in the BBB AUTO LINE program, and I agree to arbitrate the dispute." This is a bait and switch from mandatory mediation into mandatory arbitration, that a consumer will not become aware of until long after the original Warranty has been deemed legally accepted, in violation of H.R.S. Chapter 480.

75. For another H.R.S. Chapter 480 violation, this arbitration expressly does not allow the arbitrator to award the damages and remedies that are due under MMWA. Many other legal rights are expressly disallowed. This essentially strips Mr. Hemza and everyone similarly

situated of their MMWA rights, and their rights to have those claims handled in court.

76. There is no option in the BBB claim form where consumers may have BBB AUTO LINE to only mediate, but not arbitrate, their claims. Most consumers would sign the claim form thinking they are just completing a standard mediation claim form, without realizing they are being tricked into wasting money, time, and energy participating in a binding arbitral forum which may not grant them all their legal rights and remedies.

77. While this arbitration is non-binding on the consumer, in the sense that they can reject the decision if they do not like it, it is a process that once the consumer signs the BBB form they are bound to present their case in. This adds substantial costs to consumers wishing a quick mediation and path to court, especially if they retain counsel to run through this cumbersome process.

78. Furthermore, in any civil action arising out of a warranty obligation and relating to a matter considered by the Mechanism, any decision of the Mechanism shall be admissible in evidence. This is the absolute *opposite* of mediation, where the contents are expressly inadmissible in court pursuant to F.R.E. and H.R.E. Rule 408.

79. As if this were not bad enough, in the Warranty on page 34 Ford ends the BBB AUTO LINE section with: "**Note**: Ford Motor Company reserves the right to change eligibility limitations, modify procedures, or to discontinue this process at any time without notice and without obligation." [Underline added.] In other words, Ford's requirement for consumers to spend time and money submitting their disputes to BBB AUTO LINE is an illusory, unenforceable sham. Consumers have no idea what the BBB AUTO LINE process or obligations will be – nor even if Ford will even participate in the BBB AUTO LINE – at the time when they are accepting or rejecting the Warranty.

80. The foregoing are multiple individual unfair or deceptive practices violating H.R.S. Chapter 480, which damaged Mr. Hemza and cost him special damages, and which render the obligation for consumers to participate in BBB AUTO LINE mediation, and of course arbitration, void pursuant to H.R.S. §480-12.

UNFAIR OR DECEPTIVE REPEATEDLY PROVIDING FALSE LEMON LAW ADDRESSES

81. Plaintiff incorporates by reference the other paragraphs of this Complaint.

82.     The Lemon Law notice the dealer provided Mr. Hemza at the time of the subject sale had an invalid address for Ford in violation of H.R.S. 481I-3(g): "The notice must also include the name and address to which the consumer must send such written notification. The provision of this statement is the direct responsibility of the dealer...." When Mr. Hemza went to the U.S. Post Office, to transmit a required Lemon Law notice, he was told that the Ford address stated on the Lemon Law notice did not exist.  The foregoing delayed Mr. Hemza's claim and cost money in fuel going to and from the Post Office.

83.     Mr. Hemza then called Ford and spoke with one of Ford's representatives to obtain the correct address.  Ford's representative provided another, different address.  Mr. Hemza informed her that this was a different address.  She said, "You want to use the one I'm giving you."  Mr. Hemza then spent money on gas going to the US Post Office and attempted to use this second Ford-provided Lemon Law notices address at the US Post Office, which informed him this this second address was also an invalid address.

84.     Many consumers are likely to wait and try to solve their problems without taking legal action until the last chance to file Lemon Law claims may find this providing of false addresses causes their claims to be filed too late for a Lemon Law remedy, since the claims are not deemed filed until the manufacturer receives the notice.  The foregoing providing another false Lemon Law notice address cost Mr. Hemza time and money and violates public policy by unreasonably and unnecessarily extending the time and cost of the intended efficient Lemon Law procedure.  The foregoing are violations of Hawaii Lemon Law and H.R.S. Chapter 480.

UNFAIR LATE/ONGOING NONCOMPLIANCE WITH BINDING LEMON LAW AWARD

85.     Plaintiff incorporates by reference the other paragraphs of this Complaint.

86.     Mr. Hemza won his Hawaii Lemon Law case against Ford regarding this vehicle in which the arbitrator inspected and rode in it, and found that "...**transmission problems, including shuddering and/or slipping and/or revving (jumping)...did continue to exist...**substantially impair the use, safety, or value of the vehicle" and awarded Mr. Hemza $20,998.21, which was required to be paid within 30 days.

87.     As soon as the award was made, and multiple times in writing to Ford, Mr. Hemza stated he was ready, willing, and able to return the vehicle to get his refund, and asked when he

16

could get it.

88. Instead of just complying, Ford then illegally attempted to get Mr. Hemza to settle for less than the full award without any consideration, presumably to get any money at all. This offer required acceptance within 10 days. This offer caused Mr. Hemza damages including emotional distress and special damages. On information and belief it is Ford's unfair pattern and practice to offer, without consideration, to pay less than the full amount of Lemon Law awards, and merits punitive damages to punish and deter it from happening again.

89. The full required refund was never paid to Mr. Hemza. No refund at all had been paid within the 30 day window. This noncompliance caused Mr. Hemza special damages including interest on the money he did not receive when due, and on the money he still has not received, and emotional anguish because he began to think he might never be paid any refund. Offering to pay less than the full amount, not complying on time, and never paying the full amount awarded are per Hawaii Lemon Law 481I-4(f) *prima facie* evidence of violations of H.R.S. Chapter 480, and are actual violations of the same.

90. The subject vehicle cost $23,905. Mr. Hemza's household stopped using it, and bought a substitute vehicle for $12,000. They would not have purchased this vehicle had they been able to get their money back from the subject vehicle purchase, and are as such now stuck with a substandard vehicle they never wanted. Defendants thus caused $35,905.00 in special damages. Trebled per H.R.S. 480-13 this is $107,715.00.

91. Mr. Hemza also had to pay the cost to register and insure the subject vehicle all this time as they never knew what was going to happen with it.

92. Each additional H.R.S. §480-2 violation entitles Mr. Hemza to an additional $1,000 statutory damages per H.R.S. §480-13.

93. Notice of an H.R.S. §507-81 lien, on the basis of H.R.S. Chapter 480 fee shifting and other law, is hereby provided.

## DISGORGEMENT AND PUNITIVE DAMAGES

94. Plaintiff hereby realleges all other paragraphs of this Complaint.

95. From 2010 through to the present, Ford and its dealers have conspired to conceal

the Transmission Defect, from consumers in Hawaii and the rest of the U.S. as well as Canada, Australia, and possibly other countries with less developed awareness and legal recourse.

96. Ford and its dealers have gained financially from Transmission Defect concealment by:

- Getting revenue and profit selling PowerShift Transmission vehicles they could not otherwise sell.
- Selling vehicles with more expensive options, such as the PowerShift Transmission option, which consumers would not otherwise have opted to purchase.
- Selling vehicles with PowerShift Transmission warranties, which increased the price consumers reasonably paid for the vehicles, when they knew they could not and would not honor them.
- Selling ESPs, such as the one mentioned above, covering PowerShift Transmissions, when they knew they could not and would not honor them.
- Avoiding spending money replacing PowerShift Transmissions, buying back Lemons, and the related costs of Lemon Law title branding.

97. This concealment was not momentary, local, isolated, individual, or accidental; but rather lasted for years since 2010 and was worldwide, repeated, conspiratorial, and systematic corporate policy.

98. To disincentivize such concealment for profit and revenue, and prevent an unfair market advantage, Defendants must now be made to disgorge all related revenue and profit.

99. Ford's deception in this case is more reprehensible because it was part of a repeated corporate practice rather than an isolated incident.

100. Ford has been concealing PowerShift Transmission Defects around the world since 2010. Moreover, Ford has concealed defects in its transmissions before, namely, from Greg Johnson. Ford is a serial civil recidivist spanning two decades and needs to be stopped.

101. The acts of the Defendant, and each of the Defendants, was/were done knowingly, willfully, and with malicious intent, and with reckless disregard for the safety of others, and Plaintiff is entitled to punitive damages against the Defendant, and each of the Defendants, to be determined by proof at trial.

## REQUEST FOR RELIEF

WHEREFORE Plaintiff further states that the amount of his damages alleged herein falls within the jurisdictional requirement of this Court and demands judgment against the Defendants, and each of them, for:

    A.    Special damages in amounts as will be proved at trial;

    B.    Twice the finance charge;

    C.    Treble damages for the first H.R.S. 480-2 violation and statutory $1000 damages for each successive violation.

    D.    General damages in amounts as will be proved at trial;

    E.    Punitive damages in amounts as will be proved at trial;

    F.    Disgorgement of revenue and profit as will be proved at trial;

    G.    Reasonable attorney's fees and cost of suit;

    H.    Appropriate injunctive relief; and

    I.    Any and all other relief as may be deemed just and equitable by this Court.

    J.    No damages are sought in the nature of "assumpsit, etc.", as defined in H.R.S. §607-14.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiff demands a trial by jury of any and all issues in this action so triable.

DATED: June 21, 2017.

    */s/ JAMES L. WEISMAN*
    JAMES L. WEISMAN
    BRUCE F. SHERMAN
    Attorneys for Plaintiff